UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

KEVIN E. BEAN,               )
                            )
            Plaintiff,       )
                            )
        vs.                  )
                            )    No. 4:12-cv-00099-SEB-WGH
INDIANA DEPARTMENT OF        )
TRANSPORTATION,              )
                            )
            Defendant.       )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment
[Docket No. 37], filed on January 29, 2014, pursuant to Federal Rule of Civil Procedure
56 and Local Rule 56.1, and Plaintiff's Motion to Strike [Docket No. 61], filed on April
7, 2014. Plaintiff, Kevin E. Bean, brings this claim against his former employer,
Defendant Indiana Department of Transportation ("INDOT"), alleging that INDOT
terminated him because of his sex (male), in violation of Title VII of the Civil Rights Act
of 1964 ("Title VII"). For the reasons detailed in this entry, we <u>DENY</u> Plaintiff's Motion
to Strike and <u>GRANT</u> Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>**

**General Background**

Kevin Bean began working for INDOT in 1994 as an at-will employee. He started
out as a mechanic and served in that position for almost ten years. In 2004, Mr. Bean
earned a promotion and began working in INDOT's subdistrict office located in Aurora,

1

Indiana, where he ran special jobs for the subdistrict manager, which included drafting schedules for salting, mowing and other maintenance tasks, arranging to have the necessary equipment for jobs, and participating in the creation of reports on mowing and salt usage. Bean Dep. at 17-20.

In August 2010, Mr. Bean earned a promotion to Aurora-unit foreman. While employed as the unit foreman, Mr. Bean reported directly to Tom Armbruster, the sub-district operations manager. Mr. Armbruster was supervised by Gary Vandegriff who in turn reported to the district manager, Kathy Eaton-McKalip. Both crew leaders as well as maintenance workers for the Aurora Unit reported to Mr. Bean. During the relevant time period, Teresa Souders and Mark Miller were the two crew leaders in the Aurora Unit, which also included ten highway maintenance crew members. *Id.* at 32-34; Miller Dep. at 6. As unit foreman, Mr. Bean was responsible for supervising the Aurora Unit, maintaining the highways located within the Unit, ensuring a safe environment for those who worked there, monitoring the weather, and checking on job sites.[1] Bean Dep. at 35-37.

---

[1] The official job description for unit foreman lists the following as essential duties/ responsibilities of the position: (1) assigning work to units and ensuring that needed materials and equipment was available; (2) ensuring the most effective utilization of personnel, time, and equipment for each task; (3) drafting short range plans to conform to material and allocated man hours; (4) establishing priorities with alternatives due to weather conditions; (5) explaining methods, procedures, scheduling, and equipment available, as well as the purpose of the job and long and short range programs that might affect the work; (6) inspecting and reviewing work for proper methods and procedures as well as ensuring the work met acceptable standards; (7) inspecting work upon completion for appearance and end result; (9) identifying training needs and providing on-the-job training and special training sessions to teach correct maintenance methods, safety, and first aid; (10) ensuring adherence to all administrative policies and procedures; (11); conducting annual job evaluations and discussing evaluations with employees; (12) conducting conferences with subordinates to ensure applicable policies, rules, and

**Plaintiff's Discipline of Crew Leader**

One of Mr. Bean's powers as unit foreman was the ability to issue reprimands. However, Mr. Bean maintains that he routinely consulted Mr. Armbruster for guidance before issuing discipline. According to Mr. Bean, he always forwarded his disciplinary drafts to Mr. Armbruster and he never issued unsigned reprimands while a unit foreman. *Id.* at 80-82. With Mr. Armbruster's approval, Mr. Bean on one occasion issued Ms. Souders[2] a reprimand for insubordination because she had come in from mowing at 1:30 p.m. when her shift did not end until 5:00 p.m. and then purposefully brought her crew in late from the job site the next day so that INDOT was required to pay them overtime. *Id.* at 83-84. In June 2009, Mr. Armbruster issued to Ms. Souders a "letter of counseling" for falsification of records and dishonesty based on her failure to honor her agreement to abstain from the use of tobacco products in order to receive a reduction in her group health insurance deductible. Souders Dep. Exh. 1. Ms. Souders signed the counseling letter at the time it was issued but testified that she does not recall the incident. Souders Dep. at 24-25, 31, 36-37.

Mr. Bean testified that he otherwise found Ms. Souders's job performance to be satisfactory and he did not issue her any other reprimands or written discipline while he was her supervisor. Bean Dep. at 33-35, 84. However, Mr. Bean also testified that

---

regulations were understood and determining problems or disciplinary action being considered; (13) making recommendations for the hiring, firing, and promotion or demotions of employees; and (14) performing related duties as required. Docket No. 38-7 (Job Description).

[2] Ms. Souders had been a crew leader in the Aurora Unit for two years before Mr. Bean became unit foreman and she worked as a crew leader under Bean for an additional two years. Before she was crew leader, she worked as a general laborer for INDOT for approximately six months.

members of her crew complained to him about working for her because she acted like she did not have to follow rules, impermissibly set her own schedule for jobs, and came in late from jobs or did not finish them. *Id.* at 51-54, 57, 95. Both Mr. Miller (the other crew leader Mr. Bean supervised) and Terri Hartwell (Mr. Armbruster's administrative assistant) testified that they had heard similar complaints about Ms. Souder's supervision. Miller Dep. at 9; Hartwell Dep. at 21-22. Despite these alleged issues as crew leader, Ms. Souders reportedly publicly stated on multiple occasions that she wanted Mr. Bean's job. Bean Dep. at 60, 65-66; Miller Dep. at 9-10, 21.

**Allegations Regarding Inaccurate Fuel Logs**

Until the events underlying this litigation occurred, Mr. Bean maintained a clean disciplinary record throughout his eighteen-year tenure, regularly received performance ratings of meets or exceeds expectations, and was consistently promoted. However, in the fall of 2011, Ms. Souders reported to Mr. Vandegriff and Brooke Coomer from Human Resources that she had concerns about Mr. Bean and Mr. Armbruster. Specifically, Ms. Souders reported that there were discrepancies in INDOT's fuel logs and that she believed Mr. Bean had falsified the logs. She further stated that fuel and other equipment was missing from the Aurora Unit. In support of her allegations, she supplied copies of fuel logs she had previously turned in to Mr. Bean. Souder Dep. at 20-24; Commer Dep. at 24. Other employees within the Aurora Unit, including Greg Shell and Ms. Hartwell reported similar issues, to wit, that the fuel logs were not accurate and that fuel was missing. Vandegriff Dep. at 45.

Throughout the time period relevant to this litigation, INDOT used a fuel truck operated by Ms. Souders to refuel its vehicles.  Ms. Souders would deliver the fuel to various job sites and the employees who refueled from the truck were supposed to record the amount of fuel used, along with the vehicle receiving it, on the log Souders kept in her truck.  Bean Dep. at 41-42, 61.  The logs were then turned over to Mr. Bean to deliver to Ms. Hartwell who entered the information from the fuel logs into the computer at the office, generating fuel usage reports that were sent straight to the Aurora subdistrict office.  *Id.* at 43-45, 55.  According to Mr. Bean, reviewing these reports was not part of his job duties as listed in his position description, nor was he told that he was responsible for entering fuel use into the fuel log when he was a unit foreman.  Mr. Bean further contends that he was not responsible for the electronic entering of fuel information from the fuel logs on to the computer and that he did not even have access to the fuel logs on his computer.  *Id.* at 43, 54-55.

Ms. Souders was responsible for completing her own fuel logs and turning them in to Mr. Bean.  Bean Dep. at 60.  Although Ms. Souders and all other employees who fueled INDOT vehicles were supposed to track their fuel use on the logs and give them to Mr. Bean each night to deliver to Ms. Hartwell, Mr. Miller testified that on one occasion he discovered that Ms. Souders had been keeping more than one month's worth of fuel receipts in the cab of her vehicle without turning them into Mr. Bean.  According to Mr. Miller, Ms. Souders's conduct caused him to be concerned that she was trying to make Mr. Bean's records appear inaccurate by failing to turn over her fuel receipts.  Miller

Dep. at 12-15; 21-22. It is not clear whether Mr. Miller ever reported this to his supervisors or anyone else at INDOT.

**Defendant's Investigation of Plaintiff**

Based on Ms. Souders's concerns, Mr. Vandegriff and Ms. Coomer commenced an investigation into the fuel records. Vandegriff Dep. at 49. During their investigation, they collected one month of fuel logs from the Aurora Unit and compared them to the copies Ms. Souders had provided from her records as well as fuel logs found on Mr. Bean's desk. Coomer Dep. at 24. Upon comparison, Mr. Vandegriff and Ms. Coomer noticed that several of the sheets showed discrepancies in the amount of fuel used; specifically, the comparison revealed that fuel was missing. Mr. Vandegriff and Ms. Coomer also observed that after Ms. Souders completed the portions of the forms she was responsible for, additional entries had been made to balance the sheets, and the previous totals were erased in order to cover up the missing fuel. *Id.* at 25-26. Mr. Bean's signature appeared at the bottom of the records that had been altered. *Id.* at 27.

As part of their investigation, Mr. Vandegriff and Ms. Coomer also interviewed crew members regarding the records and they discovered that some of the employees' signatures had been falsified. INDOT maintains that none of the employees suggested that Ms. Souders was involved in falsifying the fuel logs, and Ms. Coomer testified by deposition that two other (unidentified) male employees reported that they believed Mr. Bean may have made entries on the logs to balance out the numbers. *Id.* Mr. Vandegriff, however, testified that Ms. Souders was the only employee whom he remembered claiming that Mr. Bean had falsified fuel records. Vandegriff Dep. at 59-60. According

to INDOT, at the conclusion of the investigation, Mr. Bean was brought in to discuss the discrepancies in the fuel logs. He denied stealing fuel and altering the records, but he did not provide an alternative explanation for why or how the fuel logs had been altered. *Id.* at 33.

In addition to the fuel log discrepancies, while conducting their investigation, Mr. Vandegriff and Ms. Coomer noticed on Mr. Bean's desk certain documents containing employees' personal information including the last four digits of their social security numbers as well as written discipline forms that had not been forwarded to the appropriate employee files. Such corrective records were supposed to be sent to the central office to be logged into INDOT's system and personnel files. Coomer Dep. at 30-31; 42-43. Mr. Vandegriff was reportedly also aware of incidents in which the Aurora Unit produced a sub-standard quality product, such as when Mr. Bean's crew spread hot-mix asphalt with a front end loader, which resulted in tire tracks being left in the pavement that created rough riding roads necessitating patch work. Vandegriff Dep. at 37-40. Ms. Coomer testified that there was also an allegation that Mr. Armbruster and Mr. Bean had performed work on Mr. Armbruster's home during business hours. Coomer Dep. at 29.

**Plaintiff's Termination and Subsequent Replacement**

Mr. Bean had been placed on administrative leave without explanation on October 27, 2011, while INDOT investigated Ms. Souders's allegations against him. Although Mr. Bean was advised not to communicate with anyone from INDOT while on administrative leave, he contacted Mr. Armbruster and also attempted to contact Ms.

Hartwell.  After the investigation concluded, INDOT asked Mr. Bean to return to the office and terminated his employment on November 9, 2011.  According to INDOT, Mr. Vandegriff, Ms. Coomer, and Kathy Eaton McKalip were all involved in making the termination decision.  Coomer Dep. at 28.

Mr. Bean's termination paperwork stated that he was fired for dishonest behavior, failure to perform duties, and unacceptable conduct.  According to Mr. Bean, the first time he was made aware of the specific allegations against him was when he arrived at the office, at which point his personal effects were already boxed up and on the counter and he was terminated before he had an opportunity to respond to the allegations.[3]  Thus, contrary to INDOT's version of events, Mr. Bean claims that he did not know that he had been accused of falsifying fuel logs until after his termination was final.

Mr. Bean's supervisor, Mr. Armbruster, was also placed on administrative leave and subsequently terminated.  Mr. Armbruster was replaced by Terry Lambert, a male. Mr. Lambert then conducted interviews of candidates for unit foreman for the Aurora Unit.  Approximately two months after Mr. Bean was terminated, Ms. Souders was selected to fill his position.

**Continuing Fuel Log Problems Following Plaintiff's Termination**

In March 2012, a few months after Ms. Souders took over as unit foreperson, Aurora Unit crews were sent to clear debris and fallen trees after a tornado struck.  In October 2012, INDOT received a letter stating that after the March clean-up, ninety

---

[3] As noted above, INDOT, however, contends that Mr. Bean had been asked about the allegations before he was terminated and was given the opportunity to respond.

gallons of fuel were discovered missing.  Bean Dep. Exh. A.  According to the letter, this information was reported to internal affairs but the missing fuel was never located or otherwise accounted for and fuel logs continued to be inaccurate.  The letter questioned why INDOT continued to deal with these issues after the "guy they terminated was the person responsible for this kind of activity."  *Id.*  Mr. Miller testified that, after the tornado, Ms. Souders told him that she had failed to keep track of seventy gallons of fuel used from her nurse truck.  Miller Dep. at 23.

**The Instant Litigation**

After Mr. Bean's termination, he filed a Civil Service complaint with the State Employee Appeals Commission, contending that his termination contravened public policy and violated his First Amendment right to freedom of speech.  He did not mention discrimination on the basis of his gender in that document.  Mr. Bean's grievance was later denied and he appealed.

On April 9, 2013, Mr. Bean filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that his termination was the result of gender and age discrimination.  A notice of right to sue was issued on May 24, 2012, and on August 21, 2012, Mr. Bean filed his Complaint in this action.

<u>Legal Analysis</u>

I.      **Plaintiff's Motion to Strike**

On April 7, 2014, Plaintiff filed a Motion to Strike Exhibit 6 (documents relating to INDOT's investigation of Mr. Bean) attached to Defendant's Supplemental Designation of Evidence and the parts of Defendant's Reply in Support of its Motion for

Summary Judgment referring to Exhibit 6 because Defendant failed to produce the documents during the discovery period. INDOT concedes that the documents in Exhibit 6 should have been produced to Mr. Bean in response to his discovery requests, and in fact, pages 14 through 19 of Exhibit 6 along with the related fuel logs were produced to Mr. Bean on July 23, 2013. INDOT argues that Exhibit 6 should not be stricken because its failure to produce the documents contained therein was inadvertent and Mr. Bean has not been prejudiced by the failure to disclose.

According to INDOT, when it initially responded to Mr. Bean's discovery requests, it was unable to locate any investigation reports or notes beyond what it originally produced. However, at Ms. Coomer's and Mr. Vandegriff's depositions, they testified about the investigation they had performed including interviews and a review of fuel logs as well as notes they had taken during their investigation. Coomer Dep. at 24-33; Vandegriff Dep. at 44-45, 49-50. After those depositions, INDOT realized that there should be more documents relating to the investigation of Mr. Bean and it contends that it was only after a suggestion from Ms. Coomer that a search be done on her former computer, which she had used while employed at INDOT but was no longer in use, that pages 1 through 13 of Exhibit 6 were discovered. By that time, Mr. Bean had served four additional requests for production on INDOT, and INDOT contends that "[t]hrough miscommunication and oversight in the course of responding to those requests," counsel for INDOT failed to produce pages 1 through 13 to Mr. Bean, even though they were relevant to his requests. INDOT's counsel contends that this oversight was not noticed

until Mr. Bean claimed in his response to the motion for summary judgment that INDOT had performed no investigation before terminating him.

Exhibit 6 was cited in INDOT's reply only once in support of the following statement: "Vandegriff and Coomer did an extensive investigation to determine whether Bean was adequately performing his job duties." Def.'s Reply at 11. As noted above, Mr. Vandegriff and Ms. Coomer testified in their depositions about the investigation they performed before recommending Mr. Bean's termination, and thus, INDOT argues that Exhibit 6 is merely "illustrative of the testimony of Vandegriff and Coomer and is not cited for any facts contained within it." Dkt. No. 62 at 3. INDOT argues that, given that there is ample testimony in the record on the same subject and Exhibit 6 is only referenced once in the reply for illustrative purposes, Mr. Bean has not been prejudiced by its inadvertent failure to timely disclose the documents, and thus, Exhibit 6 should not be stricken.

Under Federal Rule of Civil Procedure 26(e), a party who has responded to a request for production must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). If a party fails to comply with Rule 26(e), "the party is not allowed to use that information … to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The determination of whether a Rule 26(a) violation is justified or harmless is

entrusted to the broad discretion of the district court." *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir. 1996) (citation omitted). Under Seventh Circuit law, the following factors are to guide the district court's discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citations omitted).

First, we note that INDOT's failure to timely disclose the documents in Exhibit 6 was inadvertent and not the result of bad faith. Beyond that, INDOT's failure did not seriously prejudice Mr. Bean since he was clearly on notice, based on the deposition testimony of Mr. Vandegriff and Ms. Coomer, that INDOT was arguing that it had conducted a thorough investigation before making the termination decision and that notes had been taken during that investigation. Therefore, the undisclosed evidence does not raise any new arguments or theories of defense, but merely provides corroborative evidence for the prior testimony already in the record. Moreover, other similar documents relating to the investigation had previously been produced to Mr. Bean, making him aware of the existence of the same type of documents as contained in Exhibit 6. Given these facts, we cannot conclude that Mr. Bean was significantly prejudiced by INDOT's failure to timely disclose pages 1 through 10 of Exhibit 6. No disruption of any trial or of the summary judgment proceedings will result from INDOT's failure to disclose. The missing documents are neither particularly helpful to Mr. Bean's case nor damaging to INDOT's such that INDOT would have had a motive for withholding them.

As previously stated, INDOT has represented that its failure to produce them in response to Mr. Bean's requests for production was inadvertent. Considering all of these factors, we <u>DENY</u> Plaintiff's Motion to Strike.

## II.     Defendant's Motion for Summary Judgment

### A.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757

(7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

### B.    Discussion

Under Title VII, an employer may not "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment on the basis of race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Here, Mr. Bean contends that INDOT terminated him because of his sex (male) in violation of Title VII.  A plaintiff may establish a case of discrimination using either the direct or indirect method of proof.  Mr. Bean has chosen to proceed solely under the indirect method; thus, we follow his lead and discuss only that method of proof as initially set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of sex discrimination using the indirect method in a reverse discrimination suit such as this one, a plaintiff must establish: (1) "'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against [men]' or evidence that 'there is something "fishy" about the facts at hand'"; (2) that he adequately performed his employment responsibilities; (3)

that he suffered an adverse employment action; and (4) that he received different treatment than similarly situated persons who were not members of the same protected class. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quoting *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003)). If the plaintiff is able to make such a showing, the burden shifts to the employer to come forth with a "legitimate, non-discriminatory reason" for its actions. *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010). If the employer is able to do so, it will prevail unless the plaintiff presents evidence that the employer's given reason is merely a pretext for discrimination. *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation omitted).

In an attempt to satisfy the first prong of the *prima facie* test, Mr. Bean references an unidentified email (which is not in evidence) in which INDOT allegedly encouraged the hiring of minorities and women. The only other evidence of background circumstances cited by Mr. Bean is an Outreach Memorandum which states that "attracting qualified minority and female applicants continues to be a problem due to low entry pay [in comparison to other local employers]" but that INDOT "will continue to make good faith recruitment efforts for qualified minorities and females as vacancies occur." Pl.'s Exh. A. It is true that the Seventh Circuit has previously ruled that reverse discrimination may not be surprising where supervisors are under particular pressure to increase minorities in the workplace. *See Preston v. Wisc. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005) (citations omitted). However, the mere fact that INDOT apparently on only one occasion noted difficulties in attracting women and minorities to the job and emphasized that it would continue to explore when possible opportunities for diversity

does not constitute evidence that INDOT supervisors were under special pressure to favor or preference minorities. Such generic efforts to encourage the hiring of minorities and women are fairly commonplace in today's world and without more are insufficient to establish adequate background circumstances.

Even assuming Mr. Bean had satisfied the first prong of the *prima facie* test, his claim fails because he is unable to show that he was adequately performing his employment responsibilities at the time he was terminated and that INDOT's reasons for terminating him were pretextual. Under the circumstances before us here, our analysis of Mr. Bean's performance of his employment responsibilities merges with the pretext inquiry because INDOT's proffered nondiscriminatory reason for Mr. Bean's discharge is his alleged failure to perform his duties in an acceptable manner and meet INDOT's legitimate job expectations. *See Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013); *Vaughn v. Vilsack*, 715 F.3d 1001, 1007 (7th Cir. 2013).

INDOT's assertion that Mr. Bean was not meeting its legitimate employment expectations at the time he was terminated is corroborated by the termination letter that states that he was being terminated for dishonest behavior, failure to perform duties, and unacceptable conduct. Ms. Coomer testified these failures included INDOT's belief that Mr. Bean was responsible for the inconsistencies in the fuel logs as well as various issues related to his managerial duties, including his failure to protect employees' personal information, and the fact that he drafted disciplinary reports which he failed to place in employees' files. Mr. Vandegriff testified that Mr. Bean was terminated because his performance was deficient in a number of different areas, including maintaining proper

17

paperwork; keeping track of materials, inventory, and other housekeeping matters; and producing substandard work for the purpose of meeting quotas. Mr. Vandegriff also testified that during the course of his investigation into the fuel log allegations, he discovered that Mr. Bean had left sensitive personnel documents with the last four numbers of employees' Social Security numbers out in plain view on his desk Mr. Bean rejoins that INDOT's proffered explanation for his termination is merely pretext for discrimination and that it actually terminated him because he is a man, given INDOT's preference for hiring women. In support of this contention, Mr. Bean points to what he contends are inconsistent reasons given for his termination among the decisionmakers throughout this litigation. He further argues that the reasons given for his termination are factually baseless and were insufficient to support his termination.

To demonstrate pretext a plaintiff must show "such weaknesses, implausibilities, inconsistencies, or contradictions in [the employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (citation omitted). Mr. Bean's contentions and evidence fall short of satisfying that burden here. His primary argument is that INDOT's conclusions that he falsified the fuel logs, left confidential information out on his desk, improperly dealt with employee disciplinary documents, and exhibited poor performance in various areas were simply in error. In support of this contention, he cites the fact that INDOT continued to have problems with missing fuel even after he was terminated replaced by Ms. Souders. He further argues that what INDOT believed to be unissued

disciplinary documents found in his desk were merely fact files that included notes about employee discipline, which, as a unit foreman, he was allowed to maintain and store in his desk for the employees he supervised. Finally, Mr. Bean contends that although it is true that he had collected the last four digits of employees' Social Security numbers for safety training, he denies leaving them out in public view on his desk.

But to demonstrate pretext, it is insufficient to show merely that the employer's "stated reason was inaccurate or unfair"; instead a plaintiff must establish that the employer did not "honestly believe" the reasons it offered to explain its actions. *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014). In other words, pretext requires "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). Mr. Bean has not made such a showing here.

Mr. Bean further argues that the fact that Mr. Vandegriff testified that other unit foreman had similar performance issues and yet were not terminated casts doubt on INDOT's proffered reason for his termination. It is true that evidence that similarly situated employees outside the protected class were treated differently can establish pretext. *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012) ("[C]omparator evidence can do 'double-duty' at both the prima facie and pretext stages."). However, the other unit foreman cited by Mr. Vandegriff are all men, and thus, part of the same class as Mr. Bean. Moreover, Mr. Bean has failed to put forth sufficient evidence from which we can determine whether the other unit foreman are suitable comparators in other

respects because, according to Mr. Vandegriff's testimony, the other unit foreman dealt with different supervisors and, in any event, none had the same collection of issues as Mr. Bean. To show that another employee is similarly situated, Mr. Bean must establish that "there is someone who is directly comparable to [him] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted). This includes assessing "whether the employees 'dealt with the same supervisor' and were 'subject to the same standards.'" *Id.* (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

In cases like this one before us, where the discrimination complained of concerns discipline or discharge, a plaintiff must show that another employee who was similarly situated to the plaintiff "with respect to performance, qualifications, and conduct" was treated differently. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (citing *Radue*, 219 F.3d at 617). Generally, this means that the plaintiff must show that the two employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." 219 F.3d at 617-18. In short, there is insufficient evidence in this record from which we can conclude that any of the other unit foreman are sufficiently comparable to Mr. Bean such that INDOT's alleged disparate treatment would raise suspicion.

Next, Mr. Bean argues that the fact that he had a long and unblemished tenure with INDOT casts suspicion on INDOT's claim that it honestly believed he was not performing his duties properly when he was terminated. However, the fact that he had previously performed satisfactorily for a number of years, while honorable, is insufficient

to establish that he was still performing satisfactorily at the time he was terminated. *See Moser v. Ind. Dep't of Corrections*, 406 F.3d 895, 901 (7th Cir. 2005) (noting that critical inquiry was the plaintiff's performance at the time of termination not throughout prior years of employment). Mr. Bean's most recent performance evaluation before his termination was conducted in February 2011, approximately ten months before he was fired, when he received a "meets" or "exceeds" rating on every category in that evaluation. However, that simply does not conclusively establish that he was meeting INDOT's expectations ten months later when he was terminated.

Finally, Mr. Bean argues that INDOT's credibility is impeached by its pattern of providing "shifting" reasons for his termination. He contends that Ms. Coomer was the only one who cited the fuel log discrepancies as the reason for termination in contrast to Mr. Vandegriff's testimony that Mr. Bean was terminated because of the managerial issues discussed above. But significantly, both of these reasons are entirely consistent with the reasons cited in Mr. Bean's termination letter.[4] The mere fact that one decisionmaker may have based a termination decision on one nondiscriminatory reason while another decisionmaker relied on another nondiscriminatory reason does not establish pretext so long as each decisionmaker honestly believed his or her individual

---

[4] Mr. Bean also argues that Ms. Eaton-McKalip, who approved his termination, was misinformed and believed he was being investigated for the falsification of crew work cards. However, although Ms. Eaton-McKalip stated that she believed that part of the investigation of Mr. Bean involved possible alteration of crew work cards, she also testified that she was aware that Mr. Bean was also being investigated because of the falsified fuel log allegation, and that Mr. Vandegriff ultimately told her that he was recommending that Mr. Bean be terminated because there was "documentation of some bad performance as far as managerial issues." Eaton-McKalip Dep. at 12. This explanation is entirely consistent with Mr. Vandegriff's deposition testimony and INDOT's proffered reasons for Mr. Bean's termination.

reason at the time the termination decision was made. For these reasons the evidence fails to support any conclusion other than that, after conducting an investigation into Mr. Bean's conduct and work performance following Ms. Souders's allegation regarding the missing fuel, INDOT decisionmakers honestly believed that Mr. Bean was not performing satisfactorily at the time of his termination. Accordingly, because Mr. Bean has failed to establish that INDOT's proffered explanation for his termination was a lie, or pretext for discrimination, his Title VII claim cannot survive summary judgment.[5]

## III.   Conclusion

For the foregoing reasons, Plaintiff's Motion to Strike is <u>DENIED</u> and Defendant's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date:   _____9/8/2014_____          _____
                                                SARAH EVANS BARKER, JUDGE
                                                United States District Court
                                                Southern District of Indiana

---

[5] Because we find that Mr. Bean has failed to show that he was adequately performing his legitimate job expectations at the time he was terminated and that INDOT's proffered reason for his termination was merely pretext for discrimination, we need not address INDOT's alternative argument that Mr. Bean failed to establish the fourth prong of his *prima facie* case, to wit, that a similarly situated employee was treated differently.

Distribution:

Carrie Atkins Barron
FREKING & BETZ
cbarron@frekingandbetz.com

Jonathan Britton Allison
FREKING & BETZ, LLC
jallison@frekingandbetz.com

Aileen E. Wenzel
INDIANA ATTORNEY GENERAL
Aileen.Wenzel@atg.in.gov

Kenneth Lawson Joel
INDIANA ATTORNEY GENERAL
kenneth.joel@atg.in.gov

Laura Lee Bowker
INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov